**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSSA DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br><br>　　　　　　　　Plaintiff,<br>　v.<br><br>**HIDDENLAYER, INC.,**<br><br>　　　　　　　　Defendant. | C.A. No. 7:26-cv-00229<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Congruent Media Resourcing LLC files this Original Complaint for Patent Infringement against HiddenLayer, Inc. and would respectfully show the Court as follows:

### I.　THE PARTIES

1.　Plaintiff Congruent Media Resourcing LLC ("Plaintiff") is a Texas limited liability company with a principal place of business located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2.　On information and belief, Defendant HiddenLayer, Inc. ("Defendant"), is a corporation organized and existing under the laws of Delaware with a place of business at 14900 Avery Ranch Blvd, #201, Austin, Texas 78717. Defendant has a registered agent C T Corporation System at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

### II.　JURISDICTION AND VENUE

3.　This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 14900 Avery Ranch Blvd, #201, Austin, Texas 78717.

5. Without limitation, on information and belief, within this state and this District, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein. In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas and this District. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas and this District. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas and this District. Defendant has committed such purposeful acts and/or transactions in Texas and this District such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6. Venue is proper in this district under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 14900 Avery Ranch Blvd, #201, Austin, Texas 78717. On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III. <u>UNITED STATES PATENT NO. 9,135,418</u>

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On September 15, 2015, United States Patent No. 9,135,418 ("the '418 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '418 Patent is titled "System and Method for Creating Secure Applications." A true and correct copy of the '418 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Congruent Media Resourcing LLC is the assignee of all right, title, and interest in the '418 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '418 Patent. Accordingly, Congruent Media Resourcing LLC possesses the exclusive right and standing to prosecute the present action for infringement of the '418 Patent by Defendant.

11. The invention in the '418 Patent relates to systems and methods for creating secure workspaces and applications, including the management and enhancement of same. (Ex. 1 at 1:16-19). The goal of the '418 Patent is to reduce security breaches by creating secure workspaces and applications. (*Id.* at 1:16-38). To do this, the '418 Patent discloses imposing functions, such as intercepts, that convert an unsecured target application to a secure application. (*Id.* at 1:54-57). These functions may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3). By adding these functions, the behavior of the secure application can be different from the original behavior of the target application. (*Id.* at 1:57-61). The '418 Patent explains that when these functions are added to the targeted application, the now secure application can be repackaged with the additional functions integrated with the original file. (*Id.* at 2:4-6).

12. The '418 patent provides details regarding how application securitization occurs. Specifically, it discloses that one way application wrapping may occur is via an automated process in which no source code is modified, thereby reducing programmer oversight and errors. (*Id.* at

3

12:19-26).  Additionally, the '418 patent provides examples of this, including 1) replacing references to system services with references to a library that applies the necessary mechanisms and policies and 2) inserting secure references into the code of an application to replace non secure references.  (*Id.* at 12:24-35).  Specifically, this securitization process may include interposing system API calls to allow a secure framework to intercept and control application functions.  (*Id.* at 21:43-49).  This process may further include encryption for additional protection of applications.  (*Id.* at 21:49-58).  One major benefit may be that management layers may be injected onto the compiled applications, removing the need for source code or developer implemented application changes.  (*Id.* at 12:36-47).

13.     The '418 patent also discloses technical examples of the use of securing applications via an intercept.  One example method is called byte code injection, which replacing byte code API calls with intercepts.  (*Id.* at 22:45-51). This is particularly useful for applications formatted for the Android operating system.  (*Id.*; *also* Figure 11; 23:45-60).  Another disclosed technical method is to link replacement calls for native object code.  (*Id.* at 22:51-57).  This method is useful for applications that use native code and do not run under a virtual machine.  (*Id.*).  An example of this type of injection is link injection, which replaces preexisting system calls or the inclusion of new instructions in an immutable entity.  (*Id.* at 24:64-25:24).  The '418 Patent further discloses that linking order may be statically or dynamically linked, and that priority can be established during runtime.  (*Id.* at 25:6-17).  Finally, a system of obfuscation may prevent further modification or reversal of the securitization process.  (*Id.* at 25:15-17).

14.     The '418 patent further discusses the technical benefits of repackaging the target application during a reconstruction phase.  (*Id.* at 24:3-21).  This is performed by a repackager.  (*Id.* at 3-7).  The repackager may be made of software or hardware elements and may be further

modified by secure object references injected before. (*Id.* at 24:7-9). In addition, this reconstructed and modified application may need a new certificate to be trusted. (*Id.* at 24:11-16).

**Asserted Claim**

15. Claim 1 of the '418 Patent claims:

A method of operating a secure application, comprising:

receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior:

in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and

via a processing unit, performing the second application behavior.

**IV. COUNT I**
**(PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 9,135,418)**

16. Upon information and belief, Defendant has directly infringed claim 1 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method by using the HiddenLayer AI Security Platform ("Accused Instrumentality").

17. **Direct Infringement**. As explained below, HiddenLayer's AI Security Platform comprises a method of operating a secure application. HiddenLayer operates a secure application by combining (1) the AI agent and (2) HiddenLayer's runtime enforcement layer into a single operational system whose behavior differs from the original agent. HiddenLayer detects malicious input prompts and undesired output, and can block content from being sent to the AI agent. HiddenLayer's AI Security Platform operates a secure application by protecting AI applications across the entire lifecycle. HiddenLayer explains how its AI Security Platform has an approach with four components. HiddenLayer's AI Runtime Security feature within its AI Security Platform

is used to prevent prompt injection, jailbreaks, data leakage, and agentic misuse. HiddenLayer is in the execution path of the AI agent. By deploying the AI Security Platform, a secure AI system can be established. HiddenLayer describes how AI agents pose security risks particularly because they do not follow predefined logic. This creates a risk that AI agents can be manipulated, misled, or make the wrong call. As described further below, HiddenLayer's AI Security Platform provides deterministic controls that create a secure application (an AI Agent with HiddenLayer's AI Agent Security solution applied) from a target application (the initial AI Agent). As further described below, HiddenLayer's AI Security Platform executes deterministic controls, which "could mean blocking destructive operations, such as deleting infrastructure, preventing sensitive data from being accessed or exfiltrated, or stopping risky sequences of tool usage before they complete."

> The HiddenLayer AI Security Platform secures agentic, generative, and predictive AI applications across the entire lifecycle, protecting IP, ensuring compliance, and enabling safe adoption at enterprise scale.

(*E.g.*, https://www.hiddenlayer.com/).

A modern AI security posture should reflect those realities. It combines familiar principles with new capabilities designed specifically for the AI lifecycle. HiddenLayer's approach centers on four foundational pillars:

1. **AI Discovery:** Identify and inventory every model in use across the organization, whether developed internally or integrated through third-party services. You can't protect what you don't know exists.

2. **AI Supply Chain Security:** Protect the data, dependencies, and components that feed model development and deployment, ensuring integrity from training through inference.

3. **AI Security Testing:** Continuously test models through adaptive red teaming and adversarial evaluation, identifying vulnerabilities that arise from learned behavior and model drift.

4. **AI Runtime Security:** Monitor deployed models for signs of compromise, malicious prompting, or manipulation, and detect adversarial patterns in real time.

These capabilities build on proven cybersecurity principles, discovery, testing, integrity, and monitoring, but extend them into an environment defined by semantic reasoning and constant change.

This is how AI security must evolve. From protecting code to protecting *capability*, with defenses designed for systems that think and adapt.

(*E.g.*, https://www.hiddenlayer.com/insight/why-traditional-cybersecurity-wont-fix-ai).



(*E.g.*, https://www.hiddenlayer.com/platform/ai-runtime-security).



(*E.g.*, https://www.hiddenlayer.com/insight/securing-ai-agents-the-questions-that-actually-matter).

At RSA this year, a familiar theme kept surfacing in conversations around AI:

Organizations are moving fast. Faster than their security strategies.

AI agents are no longer experimental. They're being deployed into real environments, connected to tools, data, and infrastructure, and trusted to take action on behalf of users. And as that autonomy increases, so does the risk.

Because, unlike traditional systems, these agents don't just follow predefined logic. They interpret, decide, and act. And that means they can be manipulated, misled, or simply make the wrong call.

So the question isn't whether something will go wrong, but rather if you've accounted for it when it does.

Joshua Saxe recently outlined a framework for evaluating security-for-AI vendors, centered around three areas: deterministic controls, probabilistic guardrails, and monitoring and response. It's a useful way to structure the conversation, but the real value lies in the questions beneath it, questions that get at whether a solution is designed for how AI systems actually behave.

(*E.g.*, https://www.hiddenlayer.com/insight/securing-ai-agents-the-questions-that-actually-matter).



(*E.g.*, https://www.hiddenlayer.com/insight/securing-ai-agents-the-questions-that-actually-matter).

18. HiddenLayer's AI Security Platform practices receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior. HiddenLayer's Security Platform wraps the AI Agent that imposes the Platform's functions on the AI Agent's functions. The secure application is the AI Agent plus HiddenLayer's runtime enforcement layer, which together form a composite application whose behavior differs from the original AI agent. HiddenLayer describes how an AI Agent (target application) has a first set of functions with a first application behavior. Specifically, AI Agents without the HiddenLayer solution applied have a risk profile that includes issues such as AI Agents interpreting goals and not instructions, lacking operating context, scaling the impact of misconfiguration, and inheriting permissions without discrimination, for example. HiddenLayer's AI Security Platform goes beyond access governance controls and security scans.

For instance, in response to a prompt injection security threat, it provides specific detection at the input and context layer of agent execution in order to provide a security benefit.



# Why Agents Present a Different Risk Profile

Most enterprise security frameworks were designed around human actors and deterministic software. AI agents fit neither model cleanly.

**Agents interpret goals, not just instructions.** When tasked with fixing a problem, an agent will determine the steps it believes are necessary to reach the desired outcome. In the AWS case, Kiro was not instructed to delete the environment; it concluded that it was the right approach. The risk is autonomous decision-making operating without clearly defined boundaries.

**Agents lack operational context.** Human engineers carry accumulated knowledge about what systems are sensitive, what changes carry risk, and when to escalate. Agents do not carry that institutional memory. They optimise for the task at hand, and that gap in contextual awareness can lead to decisions that would be immediately recognisable as wrong to an experienced person but are entirely invisible to the agent itself.

**Agents scale the impact of misconfiguration.** A single overly broad permission or a missing approval step can have consequences that propagate quickly across systems. Both incidents demonstrated that a single autonomous action, taken without intervention, can expose data or disrupt services at a scale unlikely for a cautious human operator.

**Agents inherit permissions without discrimination.** In the Amazon case, Kiro operated with permissions equivalent to a human engineer and without the peer-review controls that would apply to a person. Trust was granted implicitly rather than scoped appropriately.

a first set of functions associated with a first application behavior

(*E.g.*, https://www.hiddenlayer.com/research/ai-agents-in-production-security-lessons-from-recent-incidents).

**Protection against indirect prompt injection.** The Meta and Amazon incidents were caused by misconfiguration and over-permissioning, but a distinct and under-addressed risk is that agents can also be manipulated through the content they process. Prompt injection, for instance, arriving via documents, tool responses, retrieved data, or MCP interactions, can corrupt agent memory, override system instructions, or redirect behaviour without any change to the initiating prompt or the access controls around it. This is an attack surface that access governance controls do not address, and it requires specific detection at the input and context layer of agent execution.

specific detection and context layer comprises part of a second set of functions with a second application behavior

(*E.g.*, https://www.hiddenlayer.com/research/ai-agents-in-production-security-lessons-from-recent-incidents).

19. HiddenLayer's AI Security Platform practices in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior. HiddenLayer's AI Security Platform's guardrails act as intercepts that take priority over the AI Agent's native functions, preventing execution of the original behavior and substituting a secure behavior. HiddenLayer's AI Security Platform provides an automated response which detects, redacts, blocks, or redirects malicious activity. This is an override of the first application behavior (for instance, by an unsecured agent). HiddenLayer provides further examples of how this override occurs. The deterministic controls apply to make certain actions impossible regardless of the purpose (intent) of the first application (for example, the AI model's reasoning). HiddenLayer's AI Security Platform forces a secure application to override the first application behavior. For example, HiddenLayer describes how its detection model "classifies inputs prior to execution, operating outside the agent's reasoning process. This allows it to identify injection attempts without being susceptible to them and to stop them before any action is taken." Architecturally, this is a modification of a system internally, *e.g.*, a behavioral override, such that the now secure agent will not execute a malicious input. As a result, a prompt injection security problem may be avoided. HiddenLayer looks at how users and requesters are using AI models to determine how to "react and respond" to abuse of models.



(*E.g.*, https://www.hiddenlayer.com/platform/ai-runtime-security).



(*E.g.*, https://www.hiddenlayer.com/insight/securing-ai-agents-the-questions-that-actually-matter).



(*E.g.*, https://www.hiddenlayer.com/insight/securing-ai-agents-the-questions-that-actually-matter).



(*E.g.*, https://www.hiddenlayer.com/webinars/hiddenlayer-webinar-accelerating-your-customers-ai-adoption).

20. HiddenLayer's AI Security Platform via a processing unit, performing the second application behavior. The secure application (agent + guardrail layer) performs the second behavior via the processing unit executing HiddenLayer's enforcement logic. Once a threat is detected, the AI Security Platform enforces policies to stop unsafe actions. HiddenLayer describes specifically that its tool is not restricted only to a scanning tool or a tool that provides alerts. These alerts force teams into manual investigation and guesswork that reduces effectiveness. Instead, by including evidence, HiddenLayer is able to take action by performing a second application behavior.



Agentic Detection & Enforcement

Detect prompt injection, unsafe tool usage, and data exposure, and enforce runtime policies to stop unsafe actions.

(*E.g.*, https://www.hiddenlayer.com/platform/ai-runtime-security).

14

# Detection Isn't Enough: Why AI Security Needs Evidence

An enterprise team evaluates a third-party model before deploying it into production. During scanning, their security tooling flags a high-risk issue. Engineers now need to determine whether the finding is valid and what action to take before moving forward.

The problem is that the alert does not explain why it was triggered. There is no visibility into what part of the model caused it, what behavior was observed, or what the actual risk is. The team is left with two options: spend time investigating or avoid using the model altogether.

This is a common pattern, and it highlights a broader issue in AI security.

# The Problem: Detection Without Context

As organizations increasingly rely on third-party and open-source models, security tools are doing what they are designed to do: generate alerts when something looks suspicious.

But alerts alone are not enough.

Without context, teams are forced into:

- manual investigation

- guesswork

(*E.g.,* https://www.hiddenlayer.com/insight/from-detection-to-evidence-making-ai-security-actionable-in-real-time).

**From Alerts to Actionable Intelligence**

What's missing is not detection, but evidence.

Detection evidence provides the context needed to move from alert to action. Instead of surfacing isolated findings, it exposes:

- the exact function calls associated with a detection
- the arguments passed into those functions
- the configurations that indicate anomalous or malicious behavior

This level of detail changes how teams operate.

Rather than asking:

"Is this alert real?"

Teams can ask:

"What happened, where did it happen, and how do we fix it?"

(*E.g.,* https://www.hiddenlayer.com/insight/from-detection-to-evidence-making-ai-security-actionable-in-real-time).

21. **<u>Indirect Infringement</u>**. Upon information and belief, Defendant has been and now is indirectly infringing by way of inducing infringement and contributing to the infringement of claim 1 of the '418 Patent in the State of Texas, in this District, and elsewhere in the United States, by providing the Accused Instrumentality for use as described above by Defendant's customers. Defendant advertised, offered for sale, and/or sold the Accused Instrumentality to its customers for use in a manner that Defendant knew infringed claim 1 of the '418 Patent. For example, Defendant provided marketing material and videos advertising that the Accused Instrumentality performs the claimed method of generating a secure application from a target application designed to interact with an operating system as claimed in claim 1 of the '418 Patent. (*Supra* ¶¶17-20 (identifying marketing materials and videos)).

22. On information and belief, since Defendant became aware of the '418 patent and the infringement at least as of the date of the service of the Original Complaint, Defendant is and

has been committing the act of inducing infringement by specifically intending to induce infringement by providing the Accused Instrumentality to its customers and by aiding and abetting its use as demonstrated by the marketing materials in a manner known to infringe by Defendant. Since becoming aware of the infringing use of the Accused Instrumentality, Defendant knew that the use of the Accused Instrumentality by its customers as instructed constituted direct patent infringement. Despite this knowledge, Defendant continued to encourage and induce its customers to use the Accused Instrumentality to infringe as described above and provided instructions for using the Accused Instrumentality to infringe, including through instructional materials, support, and user's guides. Exemplary materials are cited above. (*Supra* ¶¶17-20 (identifying marketing materials and videos)). Defendant therefore knowingly induced infringement and specifically intended to encourage and induce the infringement of the '418 Patent by its customers.

23. On information and belief, since Defendant became aware of the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of contributory infringement by intending to provide the identified Accused Instrumentality to its customers knowing that it is a material part of the invention, knowing that its use was made and adapted for infringement of the '418 Patent, and further knowing that the accused use of the Accused Instrumentality is not a staple article or commodity of commerce suitable for substantially non-infringing use. As described above, Defendant was aware that all material claim limitations are satisfied by the use and implementation of the Accused Instrumentality by Defendant's customers in the manner described above yet continued to provide the Accused Instrumentality to its customers knowing that it is a material part of the invention. (*Supra* ¶¶17-20 (identifying marketing materials and videos)). As described above, since learning of the infringement, Defendant knew that the use and implementation of the Accused Instrumentality by its customers

was made and adapted for infringement of the '418 Patent. (*Id.*). A new act of direct infringement occurred each time a customer implemented and/or used the Accused Instrumentality in the manner described above. After Defendant became aware that the use of the Accused Instrumentality infringes at least claim 1 of the '418 Patent, Defendant knew that each such new use was made and adapted for infringement of claim 1 of the '418 Patent and Defendant continued to advertise and provide the Accused Instrumentality for such infringing activities. (*Supra* ¶¶17-20 (identifying marketing materials and videos)). Furthermore, as described more fully above, the Accused Instrumentality has functionality designed to perform the steps in the manner described above and is therefore not a staple article or commodity of commerce suitable for substantially non-infringing use. (*Id.*).

24. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '418 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

25. Unless a preliminary and permanent injunction is issued enjoining Defendant and all others acting in active concert therewith from infringing the '418 Patent, Plaintiff will be greatly and irreparably harmed.

26. Plaintiff is only asserting a method claim and as such the marking requirements of 35 U.S.C. 287(a) do not apply. *Crown Packaging Technology, Inc. v. Rexam, Beverage Can Co.*, 559 F.3d 1308, 1316-1317 (Fed. Cir. 2009) ("Because Rexam asserted only the method claims of the '839 patent, the marking requirement of 35 U.S.C. 287(a) does not apply."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed.Cir. 1983) ("It is 'settled in the case law that the

notice requirement of this statute does not apply where the patent is directed to a process or method." (*Quoting Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983)). Plaintiff has therefore complied with the marking requirements 35 U.S.C. 287(a).

## V. <u>JURY DEMAND</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 9,135,418 has been infringed and is being infringed, either literally and/or under the doctrine of equivalents, directly and/or indirectly, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Defendants be preliminarily and permanently enjoined from any further activity or conduct that infringes;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

June 10, 2026
DIRECTION IP LAW

*/s/Steven G. Kalberg*
David R. Bennett (IL Bar No.: 6244214)
Steven G. Kalberg (IL Bar No.: 6336131)
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667

dbennett@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*